IN ERROR.
.......
ALBANY,
Feb. 1818.
MURRAY
v.
RIGGS.
*April* 1.

————◅✳▻————

JOHN B. MURRAY, *Appellant*,
*against*
CALEB S. RIGGS, SAMUEL WARD, and
CHARLES M'EVERS, Jun. *Assignees of*
*Robert Murray*, a *Bankrupt*,
} *Respondents.*

THIS was an appeal from the Court of Chancery. The bill was originally filed by *Andrew Van Tuyl*, and the re-

A debtor in insolvent circumstances may lawfully prefer one creditor, or set of creditors, to another.

*A*. on the 23d of *March*, 1798, assigned property to *B*. in trust to pay B. and other creditors, with power of revocation, and to appoint new trusts; and on the 24th of *March*, 1798, the 21st of *March*, 1799, and the 22d of *March*, 1799, executed other assignments to *B*., all in relation to the same subject, and all reserving a like power; and on the 31st of *May*, 1800, executed an irrevocable deed to B. in trust. The late bankrupt law of the *United States* afterwards came into operation, and *A*. was declared a bankrupt. His assignees filed a bill against B., to set aside the several assignments, and to account for the property received by him. *Held*, that although the revocable deeds might have been avoided by a person previously obtaining a title from *A*., yet that the deed of 1800 was valid, and might be taken in connection with the first deed, and the other deeds might be laid out of the question, and, therefore, that the assignees under the bankrupt law, whose title subsequently accrued, could not impeach it; and that taking all the deeds together as parts of one transaction, the four first could only be regarded as voidable by creditors, and no rights of creditors having intervened, they were capable of confirmation, and were, in fact, confirmed by the deed of 1800.

A deed fraudulent in part is void, and incapable of confirmation; but a deed constructively fraudulent, as being contrary to the policy or provisions of a particular statute, is voidable only, and may be confirmed by matter *ex post facto*.

An assignment of property in trust, by a debtor, with power of revocation, is fraudulent only as regards judgment creditors, or such as are taking measures to obtain payment of their debts.

A reservation in an assignment in trust for the payment of debts, of a sum for the maintenance of the assignors, does not render the assignment void; though in case of a deficiency, the creditors are entitled to have the part reserved applied in satisfaction of their debts.

When there are mutual dealings between *A* and B., and *A*. having property of B. in his hands, B. becomes a bankrupt, *A*. is entitled to set off his debts or demands against the funds in his possession, and can only be compelled to account to the assignees of *B*. for the balance; even though the subject of the set-off would not be admissible at law.

In error.

......

ALBANY,
Feb. 1818.

Murray
v.
Riggs.

spondents *Ward* and *M'Evers*, in the year 1802, as assignees, under the bankrupt law of the *United States*, of *Robert Murray*, against *John B. Murray* and *John Innes Clark*, and others. *Van Tuyl* was afterwards removed by the creditors, and *Riggs* substituted in his place. The material facts of the case are as follows :

On the 23d of *March*, 1798, *Robert Murray*, for himself, and as attorney, duly authorized, of his partners *George W. Murray*, *John R. Murray*, and *James V. Murray*, made an assignment of all their partnership property in the *United States*, to *John B. Murray* and *John Innes Clark*. The deed recited, that the co-partners had become insolvent, and were unable to pay their debts, and that the assignees had advanced money, and become bound for them in large sums, from motives of pure friendship, and that they considered themselves bound in honour to secure the assignees as far as they were able ; and the deed also admitted that they had previously made several particular assignments to those assignees and others, for particular purposes, and for their indemnity. This assignment was made expressly *in trust*, to sell, collect, and receive the property, and to apply the proceeds to the payment of the balances due to the trustees, and to such other creditors as the assignors should, by deed, within one year thereafter, name and specify ; and to *each of them*, and at *such times*, and in *such proportions*, and *on such terms and conditions*, *as they by such deed should direct*, *and in default of such direction*, *then in trust for the grantors*, and further with power to change the trustees, &c.

On the 24th of *March*, 1798, the grantors, by deed, reciting the former deed, appointed and directed the grantees, to pay out of the property assigned, the expenses of the trust, and to retain and pay to themselves, and for divers other purposes, therein particularly specified, several sums of money therein specified ; reserving, however, to the grantors, a power by deed, at any time before a complete adjustment of the trust, within one year, to alter or revoke the appointments.

On the 21st of *March*, 1799, the grantors, by deed, revoked and annulled the appointments and trusts of the deed of the 24th of *March*, 1798, and appointed and appropriated

the property before assigned to the payment of the charges of the trust, and to the payment of the trustees and certain other specified creditors, such sums and in such proportions of the monies due them respectively as the grantors should thereafter, by deed, direct and appoint.

IN ERROR.
.......
ALBANY,
Feb. 1818.
MURRAY
v.
RIGGS.

On the 22d of *March*, 1799, the grantors, by deed, referring to the former assignment, directed the trustees to pay out of the property assigned, the expenses of the trust, and to pay themselves and divers other creditors, therein mentioned, the sums due to them, at the times, in the proportions, and upon the terms and conditions therein expressed; reserving the right and power in the grantors, by deed, at any time before a complete and final adjustment, to alter or revoke all, or any, of the said appointments and directions, and to make and declare any new appointments or trusts, at their pleasure.

On the 31st of *May*, 1800, the grantors, by deed, referred to and partly recited the former deeds of the 23d of *March*, 1798, and 22d of *March*, 1799, and recited further, that the grantors were desirous to alter the appointments made by the last of those deeds, and to make other and further appointments and directions; they did; therefore, by virtue of the power to them reserved, order and appoint, that out of the proceeds of the property assigned, the trustees should pay: (1.) all expenses incurred: (2.) towards the support of the grantors from the 28th of *March*, 1798, until they should be respectively discharged from their debts, or until one year after they should be discharged by law, a sum, not exceeding 2,000 dollars a year, for each of the grantors: (3.) to pay certain creditors named: (4.) to pay themselves certain specified debts: (5.) to pay other debts due to the trustees, and several other creditors therein mentioned, on a due liquidation, &c., and generally to pay all persons who were or should be bail for the grantors, or either of them: (6.) that the assignees should make a final settlement with the creditors last mentioned, on certain terms mentioned, and that the assignees should hold the balance of trust property, subject to the further order of the grantors, and that the creditors who should not, in one year, accept of the conditions, or

IN ERROR.
.......
ALBANY,
Feb. 1818.

MURRAY
v.
RIGGS.

should knowingly embarrass the objects aforesaid, should be forever excluded from any share under the assignment.

A separate commission of bankruptcy was issued on the 15th of *June*, 1801, against *Robert Murray*, who was then, and since 1796, had been in confinement for debt, and on the 2d of *July* his property was assigned to the plaintiffs. The respondents, in their bill, besides *Murray* and *Clark*, the trustees, also made the grantors defendants. In their bill they charged that *Robert Murray* did business in *New-York*, and that the other partners went abroad to *Europe* to avoid and defraud their creditors. That *Robert Murray*, partner, had contracted debts to upwards of 700,000 dollars; that the assignment of 1798 was fraudulent, and made to delay, hinder, and defraud the creditors. The bill further charged, that the private property of *Robert Murray*, exclusive of his share in the partnership property, was very inconsiderable, and the bill prayed that the trustees might come to an account with the respondents for all moneys received belonging to the partnership estate, and that they might be directed to deliver up all books, vouchers, and papers belonging to the estate, or firm, and that they might pay to the respondents what they were entitled to receive as assignees, and might assign and deliver over all securities, &c. and that the several assignments to the trustees might be declared fraudulent and void.

To this bill *Robert Murray*, *George W. Murray*, and *John R. Wheaton*, answered generally, setting forth their bankruptcy and discharge under the bankrupt act of the *United States*.

The answer of *John B. Murray*, admitted the several deeds of assignment and appointment, but denied fraud in any of the transactions. It stated, that within one year from the date of the last deed, certain creditors therein named, and the trustees themselves, did agree and assent to the terms expressed: that the four first deeds were delivered to the defendant *Clark*, and were afterwards mislaid or lost; that *Robert Murray* acted as agent for the trustees, in several matters relating to the trust; that the property assigned was greatly deficient in paying the

debts covered by the assignments; and that *James V. Mur-* ray, one of the partners, claimed the funds received by the trustees, and had filed his bill for that purpose. The amount received was stated, and the appellant submitted to account and pay the balance, if any, &c.

IN ERROR.
........
ALBANY,
Feb. 1818.

MURRAY
v.
RIGGS.

*Clark* having put in a similar answer, died, and the suit was revived against his executors; and in 1809, a settlement took place between the respondents and the executors of *Clark*, with the assent of *John B. Murray*, and of all other parties whose assent was deemed necessary, and a rule was entered by consent, whereby it was ordered that the executors were to retain all sums of money secured by the deeds of assignment to *Clark*, with interest and costs, and to pay the balance that might remain of the money received by him, in certain lands, at a valuation as therein mentioned, and that *Clark's* estate should, thereupon, be discharged; but the respondents were not thereby to be precluded from litigating the validity of the assignments, as to other purposes; but in case the deeds were valid as to all, or any of the trusts therein mentioned, then the funds were to be applied, after payment of expenses, in the first place, to pay the amount due to the appellant, and his late co-partner, *Mumford*. In pursuance of this order, an account was taken of the sums received by, and due to *Clark*, and the executors conveyed to the assistant register of the Court of Chancery lands, valued at 72,328 dollars and 55 cents, and paid the respondents 6,000 dollars in cash, making together 78,328 dollars and 55 cents, being the balance found to be due from *Clark*.

The cause, as to *John B. Murray*, proceeded to issue and publication, but no witnesses were examined on either side; and on the 16th of *October*, 1812, a rule was entered by consent, referring it to a master to take an account of the monies received by the defendant, *John B. Murray*, as trustee aforesaid, and of the sums paid or retained by him, and which ought to be allowed him, in pursuance of the deeds of trust, and the particulars of such receipts, payments and allowances, and *that all questions be reserved*.

The master reported on the 1st of *July*, 1816, that he had been attended by both parties, and that the appellant had

received under the trust 81,836 dollars and 99 cents, after deducting all charges and commissions which accrued thereon; that there was due to him, and to the firm of *Murry & Mumford*, under the assignment, after crediting all he had received for principal and interest, on the 1st of *September*, 1814, the sum of 95,688 dollars and 25 cents, and which, with interest to the date of the report, amounted to 102,548 dollars.

The cause came on to a hearing before the Chancellor, in *June* term, 1817, on the equity reserved, the exception of the respondents to the master's report, on the ground that *John B. Murray*, and *Murray & Mumford*, did not appear, by any thing in evidence before the master, to be entitled to be paid out of the property assigned, and also upon a petition of the appellant, stating his rights under the assignment, and the history of the cause, and praying for an order that the respondents pay to him the 6,000 dollars, received by them from the executors of *Clark*, and that the lands conveyed to the assistant register might be conveyed to him or sold, and the proceeds be paid to him, and that such sale be at the expense of the respondents, if they wish a sale, and the funds should eventually prove deficient.

On the 30th of *September*, 1817, the Chancellor made his decree, denying the petition of the appellant, and ordering that the appellant should pay to the respondents the sum of 81,836 dollars and 97 cents, which it appeared from the master's report, he had received under the assignments and deeds in the pleadings mentioned, with interest thereon, from the date of the master's report, and costs of suit; and the several assignments and deeds of trusts, in the pleadings mentioned, were thereby declared null and void.

From this decree an appeal was entered; during the pendency of which, and before it was brought to a hearing in this court, the respondents, on the 8th of *December*, petitioned the Chancellor for leave to tax their costs, and also to issue execution for the sum decreed to be paid to them, notwithstanding the appeal, unless the appellant should, within twenty days, pay the principal, interest and costs into court, or give security to be approved by a master. The petition was substantially granted, and an order made in conformity,

and from this order an appeal was likewise entered; but as the decision of the court rested entirely on the merits of the case, it will be unnecessary to take any further notice of the second appeal. For the reasons assigned by the Chancellor for his decree, see 2 *Johns. Ch. Rep.* 572. and for the reasons of the order on which the second appeal was brought, see 3 *Johns. Ch. Rep.* 160.

IN ERROR.
......
ALBANY,
Feb. 1818.
MURRAY
v.
RIGGS.

*Feb.* 16th, 23d.

*S. Jones, Jun.* for the appellant, contended, that the deed of the 23d of *March,* 1798, was not void, and that the effect of a power of appointment or revocation was not to render it void, either at common law, or under the statute of frauds, which applies only to conveyances of land, where *bona fide* purchasers are concerned; but this is not a conveyance of land, nor are the respondents *bona fide* purchasers. Besides, after the time limited for the revocation, it was certainly valid; and it was not a voluntary conveyance, but founded on valuable consideration. (*Sugd. Vend.* 242. *Cro. Jac.* 180. 454. *Powel on Powers,* 316. *Prec. Ch.* 310. *Rob. Fr. Conv.* 432.)

At all events, the deed of the 31st of *May,* 1800, is good. It is denied that that deed must necessarily be taken in connection with the former deeds, but it may be regarded as a separate and independent transaction, and is uncontaminated, even admitting that they were infected with fraud. The provision limiting the surplus to the grantors, is no more than the law would itself have implied. The creditors have come in, and accepted the terms prescribed in the deed. By this deed, the power of revocation and of appointment originally reserved, have been executed; new trusts were limited, and no new power of revocation being reserved, the trusts became irrevocable. (*Hele* v. *Bond, Prec. Ch.* 474. *Zouch* v. *Woolstop, Burr. Rep.* 1136. 2 *Ves.* 77. 211. 2 *Fonbl. Tr. Eq.* 156. n. *Digge's Case,* 1 *Rep.* 174. *Cowp.* 651.) Admitting, however, that the deed of 1800 must be coupled with the prior assignments, yet as it is irrevocable, the great objection ceases.

The deed of 1800 is not void by the statute of frauds; or if it were, it is not competent for the respondents to raise the question. No one can take advantage of the statute,

IN ERROR.
.......
ALBANY,
Feb. 1818.

MURRAY
v.
RIGGS.

but a judgment creditor, and that only during the time that the deed is revocable. (1 *Ves. Jun.* 160.) A deed, voluntary and voidable by the statute, may be confirmed and made valid, by a subsequent consideration ; (*Prodgers* v. *Langham*, 1 *Sid.* 133. *Sug. Vendors*, 436.) and marriage has been held a consideration available for this purpose. (*Sterry and wife* v. *Arden and others*, 1 *Johns. Ch. Rep.* 261.) To make the deed void *ab initio*, there must be fraud in fact ; constructive fraud is not sufficient. (2 *Wils.* 354. 4 *Johns. Rep.* 598, 599. 4 *East's Rep.* 1.) The bill in this case charges fraud, but it is denied in the answer ; and as no evidence has been produced, the only proof of the allegation must be drawn from the deed itself.

The counsel again insisted on the validity of the first deed of 1798, and examined the cases cited by the Chancellor. (*Lavender* v. *Blackstone*, 2 *Lev.* 146. S. C. 3 *Keb.* 526. *Turbuck* v. *Marbury*, 2 *Vern.* 510. *Estwick* v. *Caillaud*, 5 *Term Rep.* 420.) The grantor may reserve to himself a certain control over the property conveyed in trust, provided it be not done with a fraudulent intent ; (1 *Atk.* 188. *Luckner* v. *Freeman*, *Prec. Ch.* 105. S. C. *Eq. Cas. Abr.* 149. S. C. *Freeman*, 236.) and this position is not contradicted by *Hyslop* v. *Clark*. (14 *Johns. Rep.* 458.) A deed may be void in part, and valid as to the residue ; the voluntary part may be void, and still the parts intended for the benefit of creditors be good ; (*Fermor's Case*, 3 *Rep.* 78. *Styles*, 428.) and the question will always be, whether the intention was to hinder or delay creditors or not. A preference given to some creditors over others, is not an evidence of fraud. The Chancellor, although he questions the policy of allowing such preference, admits its legality ; and, indeed, the point is indisputable. (*Holbird* v. *Anderson*, 5 *Term Rep.* 235. 3 *Term Rep.* 521. 4 *East's Rep.* 1. 3 *Atk.* 95. 154. 5 *Johns. Rep.* 335. 3 *Johns. Rep.* 71. 6 *Term Rep.* 152. 1 *Ves.* 280. *Small* v. *Oudley*, 2 *P. Wms.* 427. *Hendricks* v. *Robinson and others*, 2 *Johns. Ch. Rep.* 283. *Wilt* v. *Franklin*, 1 *Binney*, 502.) It is essential to mercantile credit ; those persons who have the advantage of it are generally endorsers and sureties. The business creditor always makes a profit, which may be deem-

IN ERROR.
.......
ALBANY,
Feb. 1818.

MURRAY
v.
RIGGS.

ed a premium for the risk that he runs of losing his debt. Not so the indorser; he derives no gain from the responsibility which he assumes. The counsel confidently hoped that the deed would not be set aside on this ground; there must be other circumstances to render it fraudulent; and, he again asserted, that, at all events, the deed of 1800 may stand alone, and is valid.

The grantors were the absolute owners of all their property; they might have sold and disposed of it as they pleased, and could annex what trusts and conditions they pleased to the transfer. There was no necessity for words of grant or assignment. The appointment of the uses or trusts carried all their right in the subject to the trustees, and it amounted to an equitable assignment of the property. (*Peyton* v. *Hallett*, 1 *Caines' Rep.* 363. 1 *Ves.* 381. 1 *Ves. Jun.* 280. 3 *Johns. Rep.* 71. 1 *Cooke's Bank. Law*, 265. 275. 2 *Bro Ch. Cas.* 650. 3 *Bos. & Pull.* 40. 1 *Atk.* 108. 124. 126.) The funds thus appropriated were in the hands of the creditor to whom they were transferred; the debtor was under no disability to make the transfer; and, therefore, the creditor was entitled to set off his own debt against the funds in his possession. This principle pervades the whole law of bankruptcy; the creditor may retain for his debt, and is accountable only for the balance. (1 *Atk.* 183. 1 *Term Rep.* 112. 4 *Term Rep.* 211.) An actual possession under a fraudulent deed, cannot be impaired, unless there existed fraud in fact. (1 *Bro. Ch. Cas.* 420. *Prec. Ch.* 80. 142. *Sands* v. *Codwise*, 4 *Johns. Rep.* 536.)

The respondents are estopped. They have affirmed the acts of the appellant; they seek an account, and can only claim the balance. Further, they have affirmed the deed itself, as far as respects *Clark*, and have settled with his representatives. They have submitted to a reference, and the reservation which they made does not open the door to them to question the validity of the deed. The order of reference was founded on the idea that it was valid. All the parties beneficially interested under the assignment are not before the court; and it is not now too late to raise the objection. (8 *Bro. Prec. Ch.* 122. *Hickock* v. *Scribner*, 3 *Johns. Cas.* 311.)

IN ERROR.
........
ALBANY,
Feb. 1818.

MURRAY
v.
RIGGS.

*Henry*, contra, contended, that there was actual fraud. *Robert Murray* was in confinement long before these assignments.   *Robert Murray & Co.* were insolvent; some of the firm went to *Europe* in 1796, and the clandestine departure of *Wheaton* was admitted.   The counsel also insisted on the absolute power of appointment and revocation reserved to the grantors, and contended that the deed of 1800 was made in reference to, and in fraud of, the bankrupt law, which immediately after came into operation.   It was only an assignment of partnership property, and yet the joint fund was applied to the payment of individual debts, in subversion of an acknowledged principle of equity, that the partnership debts must first be paid ; and in this light, the assignment, on the face of it, was fraudulent.   (4 *Ves.* 396.   2 *Johns. Rep.* 282.   1 *Cooke's Bank. Law*, 538.)   In *May*, 1800, it was an *inchoate* deed ; it was intended to give a preference to certain creditors, but the assent of those creditors was not obtained until 1801, when the bankrupt law was in full operation.   Their assent, given at a subsequent period, when all preference between creditors was illegal, cannot be carried back, to give effect to a deed evidently made to place the property of the grantors beyond the reach of the statute of bankruptcy.   Relation shall never work a wrong or charge to a third person.   Relation is a fiction of law, and *in fictione juris semper est æquitas*.   (*Co. Litt.* 150. *a*.   3 *Rep.* 29. *b*.   *Cro. Car.* 423.)

The deed was void under the statute of the 27th *Eliz.* which has been re-enacted here.   (Sess. 10. ch. 44.)   It contained a grant of land ; and so being void in part, was void *in toto*, at least as regards creditors.   At common law an instrument may be partially void, and good for the residue :  but if part of it be made void by statute, the whole is bad.   (13 *Vin. Abr.* 57. tit. *Faits*.   2 *Sir T. Jones*, 90, 91. *Hob.* 14.   S. C. *Moor*, 856.   S. C. *Godb.* 212.   *Cro. Eliz.* 529. 1 *Mod.* 35.   *Plowd.* 68. 111.   *Ley*, 79.   1 *Bac. Abr.* 541. 549. *Carter*, 229.   10 *Rep.* 100.)   The counsel also insisted that the reservation in the deed of 1800, for the support of the assignors, rendered it void ; and that as the fact was known to the appellant, there was collusion on his part, which in equity is the same as fraud.   (*Cowp.* 434.   3 *Atk.* 757.   13 *Vin. Abr.*

57. tit. *Faits*, pl. 10, 11.) He denied that it was only competent for a judgment creditor to contest the validity of the deeds, and insisted that they had not been ratified by the settlement made with *Clark*. He contended, that the direction to pay individual creditors under the circumstances of this case made the assignment fraudulent. The coercive clause, held out *in terrorem* to the creditors, was a strong feature in the case to show, that it was the intention of the parties to keep the property locked up, until the assignors could avail themselves of the bankrupt law. Admitting that a debtor has a right to give a preference, yet it must be an absolute preference, a complete and indefeasible disposition of the property.

The appellant is not entitled to a set-off against the funds in his hands. (4 *Term Rep.* 211.) Where the assignees affirm the contract of a bankrupt, the right of set-off may be claimed; but where they disaffirm his contract, as by bringing trover, instead of *assumpsit*, the right does not exist. In an action founded on tort, or *ex maleficio*, there can be no set-off; and in the present case the bill is founded on an allegation of fraud in the deed. The appellant is not charged as a receiver of the property in question, and called upon to account; he is charged as claiming under the deed; and if the deed is vacated, every claim falls with it. Nor can he assert a right to compensation for disbursements, in relation to the subject, the whole transaction being tainted with fraud.

The objection of the want of proper parties comes now too late, and the case of *Hickock* v. *Scribner*, (3 *Johns. Cas.* 311.) cited by the opposite counsel, is inapplicable. It is a mere matter of form, and the objection should have been made in the court below. (3 *Bro. P. C.* 122. *Rogers* v. *Cruger*, 7 *Johns. Rep.* 557.)

*Hoffman*, in reply, examined, at great length, the facts in the case. He urged, that the appellant was entitled to a preference, independent of any assignment. The appellant was lawfully in possession of the property, and had a right to retain for his own debt; yet had he been an ordinary creditor, the preference given him cannot be impeached.

(5 *Johns. Rep.* 413.) The case of *Hendricks* v. *Robinson and others*, (2 *Johns. Ch. Rep.* 283.) is strong and decisive to this point. Admitting that the deed of 1798 might have been avoided by creditors, yet this not having been done, the counsel contended, that it was in the power of the grantors to affirm it, and make subsequent appointments. (*Sterry* v. *Arden*, 1 *Johns. Ch. Rep.* 261.) Conveyances can, at most, be deemed only voidable, unless the grantor himself can avoid them. But the deed of 1800 was valid; and he denied that there was any evidence of fraud, or of its being made in contemplation of bankruptcy; and as to the objection that it was void under the stat. 27. *Eliz.* (sess. 10. c. 44. 1 *N. R. L.* 75.) he insisted that the act only applied to property within the reach of the creditor by process out of the courts of his own country; but whatever real property was assigned in this case was in the state of *Virginia*, and admitting that the statute extends to personalty, the personal funds were abroad. Should, however, the court vacate the deeds, the appellant had a right of set-off under the bankrupt law, of which the court would not deprive him. (*Cook's Bank. Law*, 265. 572. 577. *Mont. on Set-Off*, 51. 1 *Ves.* 375.) If they are valid, the bill must be dismissed; if invalid, the case must be again referred to a master, to ascertain and state the balance due from the appellant, after allowing him the deductions to which he is entitled.

THOMPSON, Ch. J. It has been correctly stated, that the material question in this case grows out of the deed of the 23d of *March*, 1798, taken in connexion with the subsequent deeds between the same parties. But there have been some matters pressed into the argument which may be deemed, in some measure, collateral to the main question, and which it will be proper to notice, in order to prepare the mind for a just and correct view of those instruments. It has been broadly asserted, in argument, that the appellant was chargeable with *fraud in fact*. Upon what this assertion is bottomed, I have been unable to discover from an examination of the case. The charge is, to be sure, made in the bill; but it is met, and utterly repelled and de-

nied by the answer, and there is not a particle of proof to make out the charge. We must, therefore, reject this alle-gation as entirely destitute of foundation, arising from any extrinsic circumstances, which have been shown either to make out fraud in fact, or even to cast a suspicion upon the conduct of the appellant. If the transaction is to be stamp-ed with the character of fraud, it must arise intrinsically from the deeds themselves. Whenever the fraud, if it ex-ist at all, is to be collected only from the deeds themselves, it then becomes a question of fraud in law. No moral tur-pitude is attached to this species of fraud ; or if at all, it is in a much less degree than where actual fraud, or fraud in fact, is imputable to the transaction.

Again ; the maxim, " *equality is equity,*" has been urged, with much apparent plausibility, against countenan-cing a sinking debtor, in giving perference to any of his cre-ditors. Indeed, His Honour the Chancellor, in this case, whilst he admits the legality of such preference, doubts its policy ; and enters into many considerations, showing the abuses to which this principle may lead. Was this question submitted to this court as a question of policy, different views on the subject might be presented ; but I do not feel myself at liberty to indulge in considerations of this kind, lest the apparent equity of the rule might have undue weight when misapplied to the case before us. If there is any principle of law settled, both here and in the *English* courts, it is, that a debtor in failing circumstances may prefer one creditor, or one set of creditors, to another, ex-cept when controlled by the operation of a bankrupt sys-tem. Preferences are by that system forbidden ; but as we had no such system, at the time the deeds in question were given, we must decide this cause independent of the rules and policy peculiarly governing such cases. Although the legality of such preferences are too well established to require further consideration, it may not be amiss to no-tice some few of the adjudged cases on this question, to see how strongly the principle is fixed in our system of juris-prudence. No stronger cases need be referred to than those relied upon by the Chancellor. In the case of *Small* v. *Oudley*, (2 *P. Wms.* 427.) the assignment was made to a

IN ERROR.
.......

ALBANY,
Feb. 1818.

MURRAY
v.
RIGGS.

particular creditor, *and but the day before the act of bank-ruptcy was committed,* and was made even without the knowledge of the assignee. The Master of the Rolls sa·d, there may be just reason for a sinking trader to give a preference to one creditor before another; to one that has been a faithful friend, and for a just debt lent him, in extremity, when the rest of his debts might be due from him as a dealer in trade, wherein his creditors may have been gainers. Cases, says he, may be so circumstanced, that the trader *honestly may, nay, ought to give the preference.* These observations apply with peculiar force to the case before us. A very considerable proportion of the appellant's claim consists of moneys and bills advanced, and responsibilities incurred, as endorser, surety, and bail; all which have always been considered, in courts of justice, as having strong claims to priority and protection. So in the case of *Cock* v. *Goodfellow*, (10 *Mod.* 489.) the assignment was made to secure the fortunes of children; and the Lord Chancellor, in answering some of the objections made to the deed, observes, that the objection against it, " because made so near the act of bankruptcy, is a very frivolous one; for the deeds meant by the statute, are deeds made to defraud creditors, whereas this was a deed made to secure a just debt. But," says he, " it is objected, that this deed is made to give an undue preference to children. I know not what law or reason there is to favour this objection. Any body may make his creditor executor, and then the law gives him a preference; not only so, but the law allows the executor to give any other creditor, in equal degree, a preference." "A man who knows he must be a bankrupt, may, by law, pay off any of his creditors ; and this power, as it may be abused, so, on the other hand, may be very properly exercised. There may be particular objections in point of gratitude," &c. Here the broad and unqualified legal right to give a preference to creditors, is explicitly laid down, although it is said, it may sometimes be abused.

This, too, is the doctrine of a Court of Chancery, and not deemed in hostility with the maxim, that equality is equity. The same principle is recognized and sanctioned in the Courts of Common Law. In the case of

*Estwick* v. *Caillaud*, (5 *Term Rep.* 424.) Lord *Kenyon* says, " it is neither illegal nor immoral, to prefer one set of creditors to another." And, again, in *Nunn* v. *Wilsmore*, (8 *Term Rep.* 528.) he says, " putting the bankrupt laws out of the case, a debtor may assign all his effects for the benefit of particular creditors." So, also, in our Supreme Court, in *M'Menomy and Townsend* v. *Ferrers*, (3 *Johns. Rep.* 84.) Mr. Justice *Van Ness*, in giving the opinion of the court, says, " before the bankrupt law, debtors had a right to give a preference to *bona fide* creditors. There is nothing in our insolvent laws to prohibit it, and the bankrupt law left this right until the 1st of *June*, 1800 ;" but, admitting the deed was made with a view of giving a preference to certain creditors, and of which there was no doubt, " that," says he, " was permitted by the law of this state, and was not prohibited by the act of congress, and, therefore, not fraudulent." This is a very strong case ; for the assignment was made after the passing of the late bankrupt law, (4th *April*, 1800.) and before the time of its going into operation. (1st *June*, 1800.) Again ; in *Willis and Fontain* v. *Ferris*, (5 *Johns. Rep.* 344.) the Supreme Court say, the debtor might lawfully prefer one set of creditors to another ; that it would be a waste of time to take notice of all the cases cited in support of this point ; that of *Estwick* v. *Caillaud* fully established it.

I think I may, then, assume it as a settled and unshaken principle, both at law and in equity, that a failing debtor has a just, legal, and moral right to prefer, in payment, one creditor, or set of creditors, to another ; and not to extend the benefit of this rule, so well and so solemnly settled, to the case before us, appears to me to be admitting the principle in theory, but utterly denying to it all practical application.

With this view of the legal rights of the debtor and creditor, and stripping the case of all imputation of actual fraud, which there is no colour or ground to support, I proceed to notice the deeds under which the appellant claims to have acquired the preference he now sets up ; and to examine whether legal fraud is to be inferred from any thing contained in the deeds themselves. The only circumstance relied upon in support of the allegation of fraud is,

IN ERROR.
.......
ALBANY,
Feb. 1818.

MURRAY
v.
RIGGS.

that in some of the deeds the grantors, *Robert Murray &*
*Co.*, have reserved a power to revoke and alter the trusts
or appointments therein contained. This objection does
not apply to the deed of the 31st of *May*, 1800 ; that is ab-
solute and irrevocable. This, in connexion with the first
deed of the 23d of *March*, 1798, would, in my judgment,
be amply sufficient to protect and establish the appellant's
preference thereby gained. I do not see why the interme-
diate deeds of the 24th of *March*, 1798, and the 21st and
22d of *March*, 1799, may not be entirely laid out of view,
as it respects the rights and claims set up by the respondents.
Their title accrued after the 31st of *May*, 1800; and if, at
that time, as between *Robert Murray & Co.*, and *John B.*
*Murray*, all the title and interest of the former was trans-
ferred to the latter, there was nothing to pass under the
bankrupt assignment to the respondents. If the contro-
versy was between *John B. Murray* and some person de-
riving title from *Robert Murray & Co.*, prior to the 31st of
*May*, 1800, and whilst the property was held under the re-
vocable deeds, a very different question might be present-
ed ; but that is not the case here. The assignees of the
bankrupt, *Robert Murray*, can take nothing but what the
bankrupt himself could assign to them. (10 *Mod.* 497.
1 *Atk.* 191. *Salk.* 449.) All these intermediate deeds be-
tween that of the 23d of *March*, 1798, and the one of the
31st of *May*, 1800, if they are taken into consideration as
forming a part of the transaction, were not, as between the
parties to them, absolutely void, and incapable of confirma-
tion. A deed founded in actual and positive fraud, as
being made under the influence of corrupt motives, and
with an intention to cheat creditors, may be considered
void, *ab initio*, and never to have had any lawful existence.
The grantee in the deed may be considered a *particeps cri-*
*minis*, and is not permitted to deduce any right from an
act founded in actual fraud. But this rule is not applied
to contracts which are only considered fraudulent by con-
struction of law, as being against the policy or provisions
of some particular statutes. Such deeds are capable of con-
firmation. (4 *Johns. Rep.* 598.) " It has been a principle of
long standing, and uniformly recognized," says the Chan-

IN ERROR.
·······
ALBANY,
Feb 1818.

MURRAY
v.
RIGGS.

cellor, in the case of *Sterry* v. *Arden*, (1 *Johns. Ch. Rep.* 271.) "that a deed voluntary and fraudulent, in its creation, and voidable by a purchaser, may become good by matter *ex post facto.* It is the constant language of the books, and of the courts, that a voluntary deed, which would have been void as against creditors, may be supported and made good by a subsequent valuable consideration." (1 *Sid.* 133. 1 *East,* 95.) This doctrine, afterwards, on appeal, received the sanction of this court. Admitting, therefore, that the deeds reserving the power of revocation, come within the policy of the statute of frauds, (for they do not within the letter, as the statute relates to conveyances of land) they were voidable only, and subject to the control and confirmation of the parties, as long as the rights of third persons did not intervene and attach. The deed of the 31st of *May,* 1800, was such confirmation ; and no intervening rights of creditors had attached. No judgments or execution, or any other legal lien, was set up. The statute (1 *N. R. L.* 77.) only declares all grants of land, with power of revocation, void *against subsequent purchasers for a valuable consideration.* It is to such cases only, that the observations in *Tyler* v. *Littleton,* (2 *Brownl.* 190.) and in *Twine's case,* which have been cited and relied on, are to be applied. In *Lavender* v. *Blackstone,* (3 *Lev.* 146.) one of the principal grounds upon which the conveyance was set aside, was, because it had a proviso enabling the grantor to make leases for any term without rent ; and this was considered as putting it in his power to defeat the whole settlement. But the deed of the 31st of *May,* 1800, in this case, contains no proviso whatever, by which the grantors could defeat its operation.

It ought to be constantly kept in mind, that the conflicting claims of the parties here, did not arise whilst the power of revocation existed. That power was completely extinguished by the deed of 1800, and before the respondents acquired any interest in the subjects embraced in those deeds. There can be no doubt, but that at that time (*May,* 1800) an original assignment might have been legally made, giving to *J. B. Murray* all the claim now set up. If so, there could be no good reason against his then taking a rati-

fication, or confirmation, of any prior defective assignment. In the case of *Tarbuck* v. *Marbury*, (2 *Vern.* 510.) so much relied on for setting aside these assignments, it was a *judgment creditor* who was setting up his claim against the deed, which was set aside, because the power reserved to the grantor to mortgage and charge the estate with what sums he thought fit, was considered as amounting in effect, to a power of revocation. Where the creditor is pursuing his debtor with a judgment and execution, or in any other manner, to enforce payment of his demand, an assignment of the debtor's property, containing a power of revocation, may very well be considered as made to " delay, hinder, or defraud creditors," according to the language of the statute of frauds. But I do not see how it could, in any sense, be said to delay or hinder a creditor, who was taking no measures to enforce payment of his demand, as is the case now before us. For any thing that appears, all the creditors of *Robert Murray & Co.* were satisfied with the assignment, and the provision there made for the payment of their debts. This is an important feature, in which this case is distinguishable from the one of *Clark* v. *Hyslop*, decided in the Supreme Court, and on which so much reliance has been placed. *Clark* there was a judgment creditor, and had issued an execution against his debtor, which was levied on the property assigned to *Hyslop*. This levy was made at a time, too, when by the very terms of the assignment, the property was not held under it, that is, after some of the creditors had refused to come in and accept of the terms proposed, and before any new trusts were declared, pursuant to the provisions in the assignment. It was with great propriety there said, that locking up the property in this manner was delaying and hindering creditors. The observations of Lord *Ellenborough*, in *Meux, qui tam.* v. *Howell*, (4 *Term Rep.* 14.) would seem to show that no creditor could be considered as delayed or hindered, within the sense and meaning of the statute of frauds, except such as were taking some measures to recover their debt. He says further, that the statute was meant to prevent the operation of deeds, &c. fraudulent in their concoction, and not merely such as, in their effect, might delay or hinder other creditors. (1 *Vesey, Jun.* 160.)

IN ERROR.
.......
ALBANY,
Feb. 1818.

MURRAY
v.
RIGGS.

It is said by the Chancellor, that it may be doubted whether the power of revocation contained in the prior deeds was not continued in the deed of the 31st of *May*, 1800. This did not, however, seem to be contended on the argument, and I am not able to discover any thing in this deed to justify such doubt. It appears to me to be an absolute and irrevocable appropriation of the property and debts described in the original assignment of the 23d of *March*, 1798. It recites and adopts that deed, and gives a final and absolute direction as to the payment of the debts therein specified; and at this time there was no impediment to the grantors so doing. They were the absolute and uncontrolled owners of the property. There was no judgment or other lien upon it. They could sell and dispose of it, at pleasure; and might, most unquestionably, annex what trusts they thought proper. If, as I think I have shown, they had a just, legal, and moral right, to give preferences to certain creditors, there is no principle of law or equity that will justify taking away the preference thus given. The grantors having reserved to their own use for their maintenance and support, a part of the property covered by this deed, forms no objection to the appropriation of the residue. This is fully established by the cases I have already referred to, and is, indeed, admitted by the Chancellor in the case before us. Though in case of a deficiency to satisfy the creditors, they might apply to a Court of Equity, for the appropriation of the property so reserved, towards the payment of their demands.

Briefly to recapitulate what I have said thus far on this case : If the deed of the 31st of *May*, 1800, may be taken in connexion with that of the 23d of *March*, 1798, laying out of view, altogether, the intermediate deeds, as I think they may, in my judgment, there is no pretence whatever for setting them aside as fraudulent. They contain a clear, absolute, and irrevocable transfer and appropriation of the debts and property therein described; and this, too, at a time when the grantors were under no disabilities that disqualified them from making the assignment. But, admitting that all the intermediate deeds, which contain the power

IN ERROR.
·······
ALBANY,
Feb. 1818.

MURRAY
v.
RIGGS.

of revocation, are to be taken in connection with the others, as forming one entire transaction, still there are no grounds on which the respondents can now claim to set them aside. The power reserved to the grantors to revoke, and alter the trusts, forms the sole ground of exception. This, as between the parties, makes those deeds voidable only. If so, they are susceptible of modification and confirmation; and were modified and confirmed, and rendered irrevocable, by the deed of the 31st of *May*, 1800. If, as I have already mentioned, a controversy respecting this property had arisen between *John B. Murray* and some of the creditors of *Robert Murray & Co.*, previous to *May*, 1800, and whilst these prior deeds were revocable, a very different question might arise. The transaction might very well, in that case, be considered as an expedient to lock up the property, and keep it out of the reach of the prosecuting creditor. But the respondents come here as the assignees of *Robert Murray*, and under a title derived from him, after his assignment to *John B. Murray* was confirmed and made irrevocable. In my opinion, therefore, the decree which declares these deeds null and void, ought to be reversed.

Admitting, however, the decree, in this respect, to be correct, it cannot be affirmed throughout. The cause must, at all events, be sent back to a master to take a new account. The order of reference, and the report of the master, are all founded on the assumption that the assignment was valid. The master is directed to take an account of the moneys received, and of the moneys paid or retained by *John B. Murray*, and which ought to be allowed him in pursuance of the trust; and he has made no discrimination between the moneys received under this assignment, or otherwise. If the assignment is declared void, it cannot affect any rights which the appellant may have acquired under any previous assignments, or transactions, between him and *Robert Murray & Co.* That he had acquired such rights, sufficiently appears, from the case before us, to justify sending the cause back to a master for a new account of moneys received and paid under such prior assignment, or dealings, between the parties.

Nor does it appear to me, that the decree ordering the appellant to pay the 81,836 dollars can be sustained, even within the principles laid down by the chancellor. He does not profess to make the appellant account for any more than he received under the assignment. On this part of the case, he says, the question is, whether I ought not to go further, and make *J. B. Murray* account for the property he has received *under the assignment*, and place that also in the hands of the assignees of *Robert Murray*, for general and equal distribution; and concludes, that he cannot perceive any other alternative, but either to give complete effect to the assignment, as a fair and valid instrument, or to make *J. B. Murray* account for the property *received under it*. And the latter, he says, is the proper conclusion. Admitting this to be the correct principle, the decree makes him account for property he never did receive under that assignment, but in pursuance of arrangements antecedent to it; and this, too, without the least imputation of fraud or unfair conduct. The claim on the *British* government, and the negotiation with *Bird, Savage & Bird*, fall within this class. I do not perceive why, even laying aside the assignment, *J. B. Murray* is not entitled to retain a considerable portion of his demand, by way of set-off, under the bankrupt law. That act declares, that where there has been mutual credit given by the bankrupt and any other person, or mutual debts between them at any time before the person became bankrupt, the one debt may be set off against the other, and the balance only claimed. This provision has, under the bankrupt system in *England*, received a liberal construction, where such debts or credits have accrued, without any intention to defraud the rest of the creditors of the bankrupt. No such intention has been imputed to the appellant, prior to the first assignment of the 23d of *March*, 1798. (1 *Atk.* 228. 4 *Term Rep.* 211. 1 *Term Rep.* 285.) Lord *Hardwicke*, in the case *ex parte Deeze*, (1 *Atk.* 228.) says, " notwithstanding the rules of law, as to bankrupts, reduces all creditors to an equality, yet it is hard, when a man has a debt due from a bankrupt, and has, at the same time, goods of the bankrupt in his hands, which cannot be got from him without the assistance of law or equity, that the assignee

IN ERROR.
　⋯⋯⋯
ALBANY,
Feb. 1818.

MURRAY
v.
RIGGS,

should take them from him, without satisfying the whole debt; and, therefore, the clause in the statute relating to mutual credit has received a very liberal construction; and there have been many cases which that clause has been extended to, where an action of account would not lie ; nor could the Court of Chancery upon a bill decree an account.'' That mutual credit was not confined to pecuniary demands, but extended to all cases where the creditor had goods in his hands of the debtor, and which could not be got at without an action at law, or a bill in equity. Numerous cases might be cited, both at law and in equity, which sanction and enforce this principle. But I think it unnecessary further to pursue this part of the case, as I place my opinion principally upon the validity of the assignments, especially the one of the 31st of *May*, 1800, in connection with that of the 23d of *March*, 1798. I am, accordingly, of opinion, that the decree of the Court of Chancery ought to be reversed.

SPENCER, J. was absent on account of sickness.

YATES, J. concurred in the opinion of the Chief Justice.

VAN NESS, J. and PLATT, J. and eight of the senators, were of opinion, that the decree ought to be reversed in part only ; but a majority of the court concurring in the opinion delivered by the Chief Justice, it was ORDERED, ADJUDGED, and DECREED, that the decree of the Court of Chancery be wholly reversed, on the ground, that the assignment of the 31st of *May*, 1800, was legal and valid.

Decree of reversal.

END OF THE CASES IN ERROR.