FRAUDS—CHARGE TO GRAND JURY IN RELATION TO FRAUDS ON THE REVENUE. See Cases Nos. 18,247 and 18,251.

FUGITIVE SLAVE LAW—CHARGE TO GRAND JURY IN RELATION TO FUGITIVE SLAVE LAW. See Cases Nos. 18,261, 18,262, and 18,263.

# G.

GANSEVOORT (UNITED STATES v.). See Case No. 18,313.

GEORGETOWN, CORPORATION OF, v. UNITED STATES. See Case No. 18,281.

———

## Case No. 18,297.

### GOODRICH et al. v. DOBSON.

[43 Conn. 576.]

(District Court, D. Connecticut. April 22, 1876.)

BANKRUPTCY—MUTUAL CREDITS—SET-OFF.

[One to whom a bankrupt is indebted for money advanced, and who, before the bankruptcy, has purchased a note of the bankrupt, having in his possession at the time of the bankruptcy goods of the bankrupt, consigned to him for sale, may sell the goods, and, as against a claim for the proceeds, set off his claims against the bankrupt, under Rev. St. § 5073, providing "that in all cases of mutual debts or mutual credits between the parties, the accounts between them shall be stated and one debt set off against the other, and the balance only shall be allowed or paid; but no set-off shall be allowed of a claim in its nature not provable against the estate" of the bankrupt.]

Submission to arbitration of controversy between Goodrich & Lockwood and John S. Dobson, assignee in bankruptcy.]

H. C. Robinson, for plaintiffs.
A. P. Hyde, for defendant.

SHIPMAN, District Judge. E. Crosby & Sons were manufacturers in Connecticut, who were in the habit of consigning their goods to Goodrich & Lockwood, merchants in New York, for sale. The manufacturers were adjudicated bankrupts upon their own petition, and John S. Dobson was appointed assignee upon their estate. Goodrich & Lockwood proved a debt against the bankrupts which amounted to $16,595, the same being for cash advances by the consignees to the bankrupts on merchandise consigned for sale, and $3,935 for notes of E. Crosby & Sons, purchased by Goodrich & Lockwood for value, before any act of bankruptcy by said bankrupts, and without collusion, and without suspicion of insolvency of the makers, and at a rate fairly predicated upon their solvency, and without the knowledge of the makers. Goodrich & Lockwood held at the time of the bankruptcy, and at the time of making said proof, merchandise on hand then estimated as of about the value of $15,750, which has since been sold by them for a sum sufficient to pay both said advances and said notes. They now retain the amount of the advances and of said notes, claiming a right so to do, in payment therefor, and by way of set-off and mutual credit. The assignee denies their right to retain the proceeds of said sales beyond the amount of said advances, and the parties have submitted the question of such right to my arbitrament.

The question which is at issue between the parties depends upon the meaning of the term "mutual credits," contained in section 5073 of the Revised Statutes, formerly known as the twentieth section of the bankrupt act, which section is as follows: "That in all cases of mutual debts or mutual credits between the parties, the account between them shall be stated, and one debt set off against the other, and the balance only shall be allowed or paid;

but no set-off shall be allowed of a claim in its nature not provable against the estate: provided that no set-off shall be allowed in favor of any debtor to the bankrupt of a claim purchased by or transferred to him after the filing of the petition, or, in cases of compulsory bankruptcy, after the act of bankruptcy, or in respect of which the adjudication shall be made, and with a view of making such set-off." No question is made that the notes are not provable against the estate of the bankrupt, and it is also admitted that if, prior to the bankruptcy, the goods had been converted into money, the assignee could not properly claim any sum beyond the balance due from Goodrich & Lockwood upon their entire account. But it is claimed, inasmuch as the goods were in specie at the time of the bankruptcy, and as no lien existed thereon except for the advances, and as no contract had been made by which they were to be sold to pay any and all indebtedness, that these goods did not constitute a "mutual credit," within the meaning of the section which has been quoted. The sole question is whether, under the circumstances which have been stated, the goods were a "credit," so that their avails can be applied in payment of the notes of the bankrupt.

The term "mutual credits" is one which is not generally used in the statutes of the different states relating to set-off, and is peculiar to the bankrupt laws of England and of the United States. It has a more extensive meaning than the term "mutual debts," and has received a liberal construction in England for the benefit of trade and commerce. The twenty-eighth section of 5 Geo. II. c. 30, provided: "That where it shall appear to the commissioners, or the major part of them, that there hath been mutual credit given by the bankrupt and any other person, at any time before such person became bankrupt, the commissioners, or the major part of them, or the assignees of such bankrupt's estate, shall state the account between them, and one debt may be set against another; and what shall appear to be due on either side, on the balance of such account, or the setting such debts against one another, and no more, shall be claimed on either side respectively." In Rose v. Hart, 8 Taunt. 499. Gibbs, C. J., defines "mutual credits" as follows: "Something more is certainly meant here by 'mutual credits' than the words 'mutual debts' import; and yet, upon the final settlement, it is enacted merely that one debt shall be set against another. We think this shows that the legislature meant such credits only as must in their nature terminate in debts; as where a debt is due from one party, and credit given by him on the other for a sum of money payable at a future day, and which will then become a debt, or where there is a debt, on one side, and a delivery of property with directions to turn it into money, on the other, in which case the credit given by the delivery of the property must in its nature terminate in a debt, the balance will be taken on

the two debts, and the words of the statute will in all respects be complied with; but, where there is a mere deposit of property without any authority to turn it into money, no debt can ever arise out of it, and therefore it is not a credit within the meaning of the statute."

As thus expounded, the familiar doctrine of the right to set off mutual debts is enlarged by the addition of the term "mutual credits"; so that, if one party owes a debt which is due at the time of the bankruptcy to a person who is indebted to the other in a sum payable in futuro, the one debt may be set off in bankruptcy against the other; and if, at the time of the bankruptcy, A., a bankrupt, owes B. a debt, and has also placed goods in his hands with directions generally to turn into money, though not on account of or in payment of that particular debt, the goods are a mutual credit, and their avails, when sold, which avails have then become a debt due to A.'s assignee, may be set off against the debt which is due from the bankrupt. It will be observed that this principle has no reference to any legal or equitable lien which has been created by contract or custom between the parties, but rests entirely upon the statute. It is also to be remembered that it was never supposed that goods or choses in action which had been deposited by the bankrupt with a person for a particular purpose, as a collateral security for a specific debt, or upon pledge, or upon trust, were a mutual credit; nor that the avails of such property, if it was sold after the filing of the petition, could be used as a set-off against any other debt or general balance due to such person from the bankrupt. The decision in Rose v. Hart, which was carefully considered, and which was a modification of previous decisions, has ever since been regarded of paramount authority by the English courts. Subsequent decisions have somewhat varied from each other as to the exact meaning of that part of the opinion which states that "the credits must in their nature terminate in debts"; and it has been insisted by eminent judges that those goods only could be considered a mutual credit "when, from the nature of the transaction, and according to the terms of the contract or contracts between the parties, the demands arising on the one side and on the other must necessarily result in mutual pecuniary debts." Dissenting opinion of Kelly, C. B., in Astley v. Gurney, L. R. 4 C. P. 724. As this distinction is one of great importance in this case, and, if it is supported by the weight of authority, is decisive against the claim of the consignees, an examination of the later English decisions becomes necessary.

The three important decisions upon this subject are Young v. Bank, 1 Deac. 622, Naoroji v. Bank of India, L. R. 3 C. P. 444, and Astley v. Gurney, L. R. 4 C. P. 714. The facts in Young v. Bank, which are substantially taken from the syllabus of the case, are as follows: Palmer & Co., having

borrowed a large sum of the Bank of Bengal, deposited the promissory notes of the government of Bengal (commonly called the "company's paper") as a collateral security, accompanied with an agreement, in writing, authorizing the bank, in default of repayment of the loan by a given day, to sell the company's paper for the reimbursement of the bank, rendering to Palmer & Co. any surplus. Before default was made, Palmer & Co. were declared insolvent, under the India insolvent act, which contains a provision in regard to set-off similar to the section of the act of Geo. II. which has been cited. At the time of the adjudication in insolvency, the bank were also holders of two notes of Palmer & Co., which they had discounted for them before the transaction of the loan and the agreement as to the deposit of the company's paper. The time for repayment of the loan having expired, the bank sold the company's paper, the proceeds of which, after satisfying the principal and interest due on the loan, produced a surplus. "In an action by the assignee of Palmer & Co. against the bank to recover the amount of this surplus, held, that the bank could not set off the amount of the two promissory notes, and that the case did not come within the clause of mutual credit in the bankrupt act." It will be perceived that the paper which was deposited by the bankrupt with the bank was as collateral security for the repayment of a particular loan. Lord Brougham, who gave an elaborate opinion in the case, does not rest his decision entirely upon that ground, however, but substantially holds that the doctrine of mutual credit only applies where the person who had given the credit "had placed the other party in a situation which he himself could not alter, had given him funds of which he could not dispossess him, or, which is the same thing, a power over funds which he could not revoke"; and that Palmer & Co. had not placed themselves in this position, because they could at any time, by repaying the moneys advanced, have regained possession of the deposit, and determined the power of sale, and thus have prevented the bank from ever receiving the surplus. The court considered the decision in Rose v. Hart to be "that such a set-off is only competent to the pawnee where the thing alleged to be a giving of credit either constitutes a present cross debt or must end in one." If the opinion of Lord Brougham, though not necessary to the decision of that case, was now the law of England, it would follow that in the case now under consideration no mutual credit existed, for the assignee could probably have compelled the consignees to deliver up the goods at the time of his appointment, by the repayment of their cash advances, and have determined their power of sale.

In Alsager v. Currie, 12 Mees. & W. 751, the court of exchequer pointed out the facts upon which Young v. Bank really turned;

and in Naoroji v. Bank of India, L. R. 3 C. P. 444, Byles, J., bluntly declares that "the case is a very doubtful authority." In the Bank of India Case "the plaintiffs were in the habit of drawing bills upon merchants in Bombay, and handing them to the defendants, bankers in London, for collection by the defendants' Bombay branch; the proceeds, when received, being remitted by the Bombay branch to the plaintiffs through the defendants' house in London. The plaintiffs executed a deed of inspectorship under the bankrupt act." The defendants had then in their hands bills of the plaintiffs to the amount of £3,248, which were subsequently collected. "At the same date the plaintiffs were indebted to the defendants on certain bills of exchange in the sum of £8,335." The plaintiffs insisted, upon the authority of Young v. Bank, that the deposit of the bills for collection was not a mutual credit, because, at the time of the bankruptcy, the assignee could have revoked that authority, and recalled the bills. The court held the case one of mutual credit. The importance of the decision to the present discussion consists in the definitions which the judges give to the expression "mutual credit," and in their disregard of the rigid construction which Lord Brougham had placed upon the language of Chief Justice Gibbs. Byles, J., says: " 'Mutual credits' I conceive to mean simply reciprocal demands, which must naturally terminate in a debt. It seems to me that the transaction described in this case would naturally terminate in a debt." Montague Smith, J., says: "To bring a case within the act, it is not necessary that the credits should be dependent the one upon the other, nor that there should have been any agreement beforehand. The object of the enactment seems to me to have been that where merchants have had mutual dealings, each giving credit to the other, relying upon each other's solvency, in the event of the bankruptcy of one of them the account shall be taken between them of all such credits and dealings as in the natural course of business would end in debts, and the balance shall be the debt due from the one to the other."

Astley v. Gurney, L. R. 4 C. P. 714, next came before the court of common pleas. The facts as stated in the syllabus were that on March 30, 1865, Joyce & Co. indorsed and deposited with the defendants bills of lading for cotton and coffee valued at £7,048, as collateral security for the defendants' acceptance for £5,000. On April 5th, Joyce & Co. indorsed and deposited with the defendants bills of lading for other cotton, valued at £4,280, and four bills of exchange, amounting to £2,400, as collateral security for a further acceptance of the defendants for £5,000. Joyce & Co. were at this time already largely indebted to the defendants upon bills which the defendants had discounted for them, and which were

subsequently dishonored; and, on May 19th Joyce & Co. became bankrupt. Before their bankruptcy, Joyce & Co. gave their assent that the defendants should sell the cotton and coffee, and receive the proceeds. The cotton was sold, and the proceeds received by the defendants before the bankruptcy of Joyce & Co. The coffee did not arrive until after the bankruptcy. It was then sold by the defendants. The four bills deposited with the defendants were duly paid. The securities deposited on March 30th and April 5th realized £11,816. 12s. 3d., thus leaving, after payment by the defendants of two acceptances of £5,000 each, a balance of £1,816. 12s. 3d., which the defendants claimed to set off against the debt due to them from Joyce & Co. Held by the court of common pleas, upon the authority of Naoroji v. Bank of India, a case of mutual credit, as to the cotton and coffee; aliter as to the bills, upon the authority of Young v. Bank; and judgment was given for the plaintiffs for £1,816. 12s. 3d. The exchequer chamber (Kelly, C. B., dissenting) reversed the judgment. The court of exchequer seem to have supposed that the common pleas held that the coffee was not a mutual credit, and base their decision upon the fact that Joyce & Co., before their bankruptcy, gave their assent to the sale by the defendants of the cotton and coffee, and to their receiving the proceeds. Cleasby, B., giving the opinion of the court, says: "It appears to us that this authority altered the relation of the parties, and that, so soon as it was given, credit was given to Overend, Gurney & Co. for the proceeds of the sale, and the case is brought within the authority of the case in the common pleas of Naoroji v. Bank of India."

The facts of that case and of the present bring them within the second rule laid down by Gibbs, C. J., in Rose v. Hart. Kelly, C. B., in his dissenting opinion, did not fail to point out that the authority to sell did not take away from Joyce & Co. the power to provide themselves for the acceptances, and to take back the bills of lading, and thus that the coffee was not necessarily to be converted into money, and ought not to have been treated as money. The majority of the court, however, clearly held with the court in the Bank of India Case, that, where the natural result of the arrangement between the parties in the ordinary course of business would be the conversion of the property into money, such a delivery constituted a mutual credit. It can therefore now be considered that so far as Young v. Bank is an authority for holding that, to constitute a mutual credit, the authority to sell must be irrevocable, the authority is overruled in England. It may be added that the dicta in Murray v. Riggs, 15 Johns. 571, and Ex parte Caylus, Low. 550, Fed. Cas. No. 2,534, —the American cases which are directly upon this point,—are in conformity with Rose v. Hart. The remark of Judge Woodruff in

Clark v. Iselin, 10 Blatchf. 211, Fed. Cas. No. 2,825, that "any collections in excess of the advances for which they [the assets of the bankrupt] were specifically pledged, made after the filing of the petition, were collections for the account of the consignees, and as to them no such right of set-off exists," refers to collections of assets which were pledged as collateral security for a specific debt, which assets, while they existed in specie, did not constitute a mutual credit, and the avails of which, unless collected before the filing of the petition, could not therefore be used as a set-off. It is true that Lord Brougham's rule is one which relieves assignees from responsibility, and does not cast upon them the burden of deciding whether they will or will not raise the money to pay the consignees cash advances, and take possession of the goods; but upon principle, if a consignee who has at the time of the bankruptcy in his possession goods of the bankrupt, which must necessarily be sold by the terms of the contract, can retain the avails as a set-off against any debt of the bankrupt, it would seem that he could also, with as much propriety, retain the avails of goods which he was directed to sell, and which at the time of the contract of the unsecured debts must be sold in the ordinary course of business, and which, therefore, naturally constituted the basis of the credit given to the bankrupt, and which goods had been sold without objection. The factor has no higher equitable title to the money in the one case than in the other. In each case the effect of the sale is to give him an advantage over the other creditors, and an advantage to which he has no more superior equity in a case where the property must necessarily be converted by him into money, than where it must be sold unless the assignee prevents the sale by paying the liens upon the property.

If the notes of E. Crosby & Sons had been directly given to Goodrich & Lockwood for moneys loaned to the former, though without reference to the goods, or for property purchased by the bankrupts from Goodrich & Lockwood, the merchandise would clearly have been a mutual credit, under all the decisions except Young v. Bank. It is, then, to be considered whether the fact that the notes were purchased of these persons without the knowledge of E. Crosby & Sons, though with no suspicion of their insolvency, varies the rights of the parties. The notes are a debt provable against the bankrupt estate, and, if the goods constitute a credit given by the bankrupts to the consignees, the avails of the goods may be set off against any provable demand which Goodrich & Lockwood have against the bankrupts; and it is not material whether that claim consists of purchased notes of the bankrupts or of money directly loaned to them. Alsager v. Currie, 12 Mees. & W.

757. The important question to be determined is, were the goods deposited under such circumstances that they constitute a credit?. And, if they were a credit, the only remaining question to be decided by the assignee and the creditor, under the twentieth section, is, what is the balance of money due to or from the consignee upon the final statement of his account with the bankrupt estate? In cases of involuntary bankruptcy, it would not seem, under the amendment of June 22, 1874, to be important where or for what purpose the claims against the bankrupt were purchased, provided they were not purchased after the filing of the petition. As has been suggested, the material question in cases of this class is, were the goods delivered under such circumstances as to constitute a mutual credit? The conclusions which are sanctioned by the authorities are that where a known debt is due from the bankrupt, and goods have been deposited with the creditor, not as a pledge, for sale under such circumstances of dealing between the parties that a conversion into money is, in the ordinary course of business, the natural result of the transaction, such goods constitute a mutual credit given by the bankrupt to the other; and when they are sold, either before or after the filing of the petition, the avails may be set off against any unsecured claims due from the bankrupt, under the restrictions provided in section 5073 of the Revised Statutes. Goods deposited as a pledge or as collateral security are not a mutual credit; but if sold before the filing of the petition, in good faith, the excess above the debt for which they are security becomes a debt of the consignee to the bankrupt, capable of being set off like any other mutual debt. If such goods are sold after the filing of the petition, the excess belongs to the assignee.

Upon the foregoing principles, it follows that nothing is due from Goodrich & Lockwood to the estate of E. Crosby & Sons.