## STOCKTON *v.* CRADDICK.

An attachment by a creditor of a fraudulent vendee of real estate, not proved to have had notice of the nature of the vendee's title, levied on the property while in the possession of his debtor, will hold the property against creditors of the fraudulent vendor.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge*, J. *Stockton*, plaintiff, *pro se*, and *Steel*, who was with him, in support of plain-tiff's right, cited 11 La. 408.   15 Vesey jr. 331.   13 La. 126.   8 La. 14.   16 Peters, 14.   2 An. 196, 249.

*Benjamin* and *Micou*, for the appellants, *Hyde* and *Clapp*. If *Stockton* had purchased the property from *Craddick*, for a valuable consideration, on the *faith of his apparent title*, and without notice of the fraud; if *he, had under similar circumstances*, loaned his *money to Craddick*, on a mortgage of the property, or if, in *any manner whatever*, he *had trusted the apparent owner, under the title*, he would undoubtedly be entitled to the favor of the court, and the protection of the prin-ciple of law on which he relies.    But this principle has no application whatever, to the case of *Stockton*.    To ascertain his real position, interrogatories were ad-dressed to, and answered by, him.    We are quite willing to take his own state-ment on this point.    To these interrogatories he answered that: He became owner, in the State of Mississippi, of the notes which are the basis of the suit no. 3368, just before the filing of said suit, that is only a few days before the said filing; and of the note which is the foundation of suit no. 3402, only a few days before the filing the petition therein; the precise day he acquired said notes does not now recollect.    He obtained all said notes from one *Abram B. Reading*, then, and, as affiant believes, now a resident of the city of Vicksburg, and State of Mississippi.    He did not pay any money for said notes—for the notes which are the foundation of suit no. 3368, he agreed with said *Reading* to pay him *eighty cents on the dollar*, and for the other note which is the foundation of the suit no. 3402, affiant agreed with said *Reading* to pay him sixty cents on the dollar, and it was also agreed by and between him, affiant, and the said *Reading*, that affiant was to make him said *Reading no payment for any of said notes un-til after affiant should have realized said claims against Craddick*.    This is stated according to the best of affiant's recollection and belief.    He is the sole owner of said judgment, and of the notes on which it is founded; and there is no other person either directly or indirectly interested with him in the owner-ship of said judgments, or said notes, nor is there any one who has any lien, or privilege, or claim of any kind on said notes, nor has the rights of said *Reading* to receive and recover the full amount of said notes from *Craddick* ever been questioned, ( so far as affiant knows,) before they became the *bonâ fide* property of affiant.    A few days before he purchased any of said notes, he learned by in-spection of the books of the conveyance office of New Orleans, that *Craddick* was then owner, by conveyance to him, of four lots and a fraction of ground, and of the house thereon, in Delord street, in New Orleans, of which the lots now claim-ed by *Hyde & Clapp* were two—affiant cannot recollect the precise number of days which elapsed from the time he acquired his knowledge, till he became owner of the notes.    Affiant verily believed at the time he became the owner of said notes, that *said Craddick was the real and bonâ fide owner of all* said lots of ground in New Orleans, and he so informed said *Reading* at the time.    As well as he can now recollect, he knew *Joseph N. Craddick*, the defendant, by sight, only for a year perhaps before he became owner of the said notes.    Affiant has no personal knowledge of the pecuniary circumstances of said *Craddick*; he was at one time in good credit in Vicksburg; but before affiant became the own-er of said notes he had lost credit, and affiant was informed money could not be readily made out of him on execution in Mississippi.    Affiant cannot say of his

own knowledge if he, said *Craddick*, is, or is not, insolvent, but affiant believes he is insolvent; and that he was so reputed in Vicksburg, before affiant bec\me owner of any of said notes, but for what length of time before that period affiant cannot say. He is now, and was then, but very illy informed as to the circumstances of said *Craddick*."

*Stockton* is not then a purchaser; he is not a creditor upon a new consideration, given on the faith of the paper title, and therefore does not come within the rule on which he relies. That rule is thus laid down in 1 Story's Eq. Jur., sec. 381. "In concluding this discussion, so far as it regards creditors, it is proper to be remarked, that though voluntary, and other, conveyances in fraud of creditors, are thus declared to be utterly void; yet they are so far only as the original parties and their privies, and others claiming under them, who have notice of the fraud, are concerned; for *bonâ fide* purchasers for a valuable consideration, without notice of the fraudulent or voluntary grant, are of such high consideration, that they will be protected, as well at law as in equity, in their purchases. It would be plainly inequitable, that a party who has *bonâ fide* paid his money, upon the faith of a good title, should be defeated by any creditor of the original grantor, who has no superior equity; since it would be impossible for him to guard himself against such latent frauds. The policy of the law, therefore, which favors the security of titles, as conducive to the public good, would be subverted, if a creditor having no lien upon the property, should yet be permitted to avail himself of the priority of his debt, to defeat such a *bonâ fide* purchaser. Where the parties are equally meritorious, and equally innocent, the known maxim of courts of equity is, *qui prior est in tempore, potior est in jure;* he is to be preferred who has acquired the first title."

In no treatise or case, do we find the rule otherwise laid down. It is always said to be applicable only to *bonâ fide* purchasers, upon a valuable consideration, and without notice. In *Fletcher* v. *Peck*, 6 Cranch, 133, Ch. J. Marshall, in giving the reason of the rule, says: "He has paid his money for a title good at law; he is innocent, whatever may be the guilt of others; and equity will not subject him to the penalties attached to that guilt. All titles would be insecure, and the intercourse between man and man would be very seriously obstructed, if this principle be overturned." Chancellor Kent, having held in *Roberts* v. *Anderson*, 6 Johns Ch. R. 371, that even a *bonâ fide* purchaser under a fraudulent sale, would not be protected against *creditors*, the doctrine was carefully reviewed by Judge Story, in *Bean* v. *Smith*, 2 Mason's R. 272. He contends that the rule protects against creditors as well as others, but he lays it down with the same care as in his commentaries. The price paid, the valuable consideration, is every where urged as the reason of the rule—the ground on which the equity of the purchaser, is held superior to the equity of the creditor. See also 2 Vesey, jr., 458. 8 Mart. N. S. 342. 1 Mart. N. S. 387.

But, on the other hand, it is equally well settled, that the rule does not apply to a mere creditor of the party, who receives a fraudulent title, without giving *any new credit, or new consideration on the faith of the title.* "A plea of *purchase for a valuable consideration*, will protect a defendant from giving any answer to a title set up by the plaintiff, but a plea of bare title only, without setting forth any consideration, will not be sufficient for that purpose." *Walwyn* v. *Lee*, 9 Vesey, jr., 24.

"The rule adopted in England in favor of *bonâ fide* purchasers, without notice, is founded, as we have seen, upon a general principle of public policy. *Walwyn* v. *Lee*, 9 Vesey, jr., 24. It is not, however, absolutely universal; for it has been broken in upon in two classes of cases. In the first place it is not allowed in favor of a judgment creditor, who has no notice of the plaintiff's equity. This appears to proceed upon the principle, that such judgment creditor shall be deemed entitled merely to the same rights as the debtor had, as he comes in under him and not through him, and upon no new consideration like a purchaser. *Burgh* v. *Burgh*, Rep. Temp. Finch, 28. In the second place, &c." Note to s. 410, 1 Story's Equity.

No case has been cited by the appellee, nor have we met with any even apparently changing the doctrine thus precisely laid down, except that of *Foster* v. *Foster*, 11 La. Rep. 401. In that case, *Thomas Foster* having made a fraudulent conveyance to *Levi Foster*, the latter granted a new mortgage for a pre-existing debt of one *William Seay*. The court placed this mortgage upon the footing of a sale, for a valuable consideration, and held that mortgagee should be equally protected, with a *bonâ fide* purchaser. The court may have considered

STOCKTON
v.
CRADDICK.

the mortgage for another's debt, as a new contract; time or indulgence may have been given to the original debtor, constituting a consideration for the mortgage, but neither of these reasons is stated in the opinion. Nor does the judge seem to intend to lay down any new rule, or to extend the operation of the rule beyond its well known limits. · We can only conclude, that there were circumstances in the case which produced their influence on the mind of the court, but which are not reported, or else that the court unadvisedly made a wrong application of a known and familiar principle. Certainly the court did not intend to say, that a mere change in the security, by creating a lien upon a property fraudulently acquired, placed the creditor in a better position than those who had been despoiled by the fraud. It is true " that third persons acting in good faith, shall not be prejudiced by the frauds of others, in which they had no agency or concern," but it is equally certain that they cannot be enriched by such frauds, at the expense of others innocent as themselves. It is more reasonable to believe, that the court was influenced by circumstances not reported, than that it was extending, unconsciously, the limits of a rule, founded on public policy, and intended strictly for the protection of those who advance their money, or make new contracts, on the faith of a recorded title. The case does not by any means go to the extent necessary to support Stockton's claims. Although a mortgage may be treated as an alienation, and the mortgagee be placed on the footing of a purchaser, it can hardly be contended that an attachment, is either a mortgage or a sale. If that opinion intended to establish even the naked proposition, that a mortgage for a precedent debt, without any new credit or consideration, is to be protected like a sale for a price actually paid, it stands alone, and finds no support either in reason or authority.

But there is still another point, in which this rule must be examined. It is applicable only, to those who have no notice of the fraud, either actual or constructive. Those who were put upon their guard, or upon enquiry, cannot plead ignorance of the fraud, or protect themselves, even where they have advanced their money on the fraudulent title; "whatever is sufficient to put a party upon enquiry, is, in equity, held to be good notice to bind him." 1 Story's Equity, sec. 400.

Stockton tells us that he had no knowledged of the fraud committed by Craddick, but he knew that Craddick was insolvent, or was generally reputed so to be. When he found on the records, in New Orleans, a sale to such an insolvent person, for a nominal consideration of $16,000 in cash, he might well be considered as put on his guard. He appears to have received a transfer of the notes sued on, in consideration of attempting an attachment at his own expense, and of a promise to divide the spoils with the former holder, if any thing should be realised. How can a litigant, thus situated, claim the equitable protection which the law gives to innocent purchasers? Hyde & Clapp trusted Hall, on the credit which the possession of the property gave to him. It became the pledge of the creditors of Hall. It was sold under execution for his debts, and is in possession of purchasers in good faith, and upon a valuable consideration.

The judgment of the court (Rost, J. absent,) was pronounced by

EUSTIS, C. J. This suit was instituted, in January, 1841, and was commenced by attachment against certain lots in New Orleans, as the property of the defendant. Judgment was rendered for the plaintiff, with privilege on the property attached, in February, 1842. Execution having been issued on this judgment, and the lots having been advertized for sale, the proceedings were enjoined at the instance of T. R. Hyde & J. S. Clapp, who claimed the lots as their property, having purchased them at a sheriff's sale, at which they were sold under executions against J. J. Hall. On a hearing, the injunction was dismissed, and Hyde & Clapp have appealed.

This case has been already once before this court, and is reported in 1st An. p. 40. It is now before us in the form of an opposition to the plaintiff's execution, called in our Code of Practice, the third opposition. An episode of the case is also reported in 10 Rob. 387. Hyde et al v. Craddick.

After the issue was joined on the original opposition, a supplemental petition was filed by Hyde & Clapp, in which it is alleged that the plaintiff is an attor-

ney and counsellor at law, licensed to practice in the several courts of this State, and that, at the time he purchased the claims on which he obtained the judgment against *Craddick*, he was practising in the late Commercial Court of New Orleans, in which the judgment was rendered, and that so far as said claims affect the rights and property afterwards purchased by the opponents they are litigious, and the sale of them to the plaintiff is absolutely null. Interrogatories were propounded to the plaintiff, who fully answered them; but we do not find that any answers was filed to the supplemental petition, though an exception was filed to it, which was afterwards withdrawn. We cannot consider this important allegation as admitted; but, as the cause was tried on its merits, we must hold it to have been at issue, under the answer of the plaintiff to the opposition filed by *Hyde & Clapp*.

The allegation relating to the plaintiff's being a practising lawyer in the court in which the attachment was instituted at the time alleged, is not proved. He had been previously admitted to the bar in this State, but we have nothing before us on which any other place of residence or business can be assigned to him than is alleged in the petition for the attachment, which is Vicksburg, in the State of Mississippi.

It appears that the plaintiff acquired the notes sued on from one *Reading*, and, on being interrogated under oath, he states that he had learned, by inspection of the books of the register of conveyances in New Orleans, that *Craddick* was the owner of the lots attached previous to his purchasing the notes, and that he verily believed, at the time of the purchase, that *Craddick* was their real and *bonâ fide* owner, and he so informed *Reading* at the time.

*Craddick* held the lots under a fraudulent title. *J. J. Hall*, an insolvent debtor, had conveyed them to *C. C. Hall*, in July, 1839, who, on the eve of absenting himself, left a power of attorney to sell them, with his wife; she conveyed them to *Robert Mott*, who took the title at the instance of *Craddick*, under the conviction that the conveyance was made for the purpose of securing the rights of the wife of *J. J. Hall*, who was *Craddick's* daughter. *Mott*, as well as *Craddick*, resided at Vicksburg, at this time; and, on finding soon after the title was made to him, that one of the *Halls* was in jail and the other had absconded, he insisted on *Craddick's* taking the title out of him, which was accordingly done, by a transfer to *Craddick*, of the date of the 14th July, 1840.

The opponents, *Hyde & Clapp*, are judgment creditors of *J. J. Hall*, and, after the plaintiff's attachment had been levied on the lots, they instituted their revocatory action to subject the property to their execution, on the ground of the fraud in the title to *Craddick*, and it was so decreed. Under this judgment execution was issued, the lots were sold under execution, and the opponents became the purchasers. This judgment was reversed on a matter of form—but a subsequent judgment was rendered, by which *Craddick's* title was decreed to be fraudulent and simulated.

The question, as it has been presented to us in argument, and it embraces the substantial merits of the cause, is, as to the liability of this property to be attached by the creditors of *Craddick*, while this fraudulent title was subsisting. We think there is no evidence charging the plaintiff with notice of the character of this title, and the matter is therefore reduced to a naked question of law.

The district judge gave the plaintiff judgment, which held the property subject to the creditor's attachment, under the authority of the case of *Foster's heirs v. Foster's administrators.* 11 La. 402,

STOCKTON
*v.*
CRADDICK.

In that case it was held that, where a fraudulent vendee of slaves, under a title valid in point of form and having the appearance of verity and good faith on its face, mortgages them to an antecedent creditor, who is ignorant of the fraud, his right will not be affected by the fraud between the original parties to the sale; and, on this ground, the verdict of a jury was reversed, and the judgment was given in favor of the mortgagees, in accordance with the views of the court on the matter of law. This decision appears to us to be in harmony with article 2236 of the Code, which provides that counter-letters can have no effect against creditors or *bonâ fide* purchasers, being valid as to all others. We have not been able to find any decision in which the rule in this case has been impugned, and the title having passed out of *Hall*, and, by intermediate conveyance, to *Craddick*, and the latter being in possession of the property at the time of the attachment, the present case case comes clearly within it. *Williams* v. *Hagan*, 2 La. 123. *Syndic of McManus* v. *Jewett*, 6 La. 531.

*Judgment affirmed.** 

---

* *Benjamin* and *Micou*, for a re-hearing. The fraud in *Craddick's* title has been twice pronounced. The plaintiff does not contest or deny the existence of this fraud, and yet he contends that, as a creditor of *Craddick*, he has a right to profit by it, and subject the property to his attachment. The question then presented, is between the creditor of *Hall* and the creditor of *Craddick*. The property really belongs to *Hall*, but *Cradd.ck* has the fraudulent title. The creditor of *Hall* claims, because the property belongs to his debtor; the creditor of *Craddick*, because his debtor has accepted and recorded a fraudulent title. Supposing them equally innocent, the decree in favor of the latter gives effect to the fraud. The fraud, which despoils one creditor, enriches another. It is not the case of an innocent purchaser, or of a mortgagee who pays or lends his money on the faith of a solemn and recorded title. It is the naked case of the creditor of an insolvent, attempting to obtain payment of his debt, through the fraud of his debtor, at the expense of innocent creditors of another fraudulent debtor.

I. Our first position is, that the title of *Craddick*, being fraudulent, was, so far as the creditor of *Hall* were concerned, void *ab initio*, and could give no rights to the creditors of *Craddick*.

The general rule that whenever a party may sell, his creditors may attach, does not contemplate the case of possession obtained by fraud. With regard to personal property, it was formerly held, that the attachment would lie except when the property had been procured by a felony; but this rule has been modified, and it is now well established that, if possession be obtained by fraud or imposition, the original owner may recover his property. Such is the rule laid down by Judge Story in *De Wolf* v. *Babbe't*, 4 Mason, 294, and followed by the late Supreme Court in *Gasquet* v. *John on*, 2 La. 516. In the latter case, possession had been obtained on the faith of a letter of credit, which had been revoked. The court held that, the use of such a letter, after it was recalled, was equivalent to forging a new letter; and, although the merchandize had been brought from Philadelphia to New Orleans, by the defendant in attachment, the vendor recovered against the attaching creditor. So in *Prall* v. *I'ce'*, 3 La. 282, the court say that the fraud charged by the petition, and found by the jury, was sufficient to authorize the court to consider the sale in question void *ab initio*, and not translative of property. It is only when the vendor has voluntarily parted with the possession, that his equity is not equal to that of a *bonâ fide* purchaser for a valuable consideration. *Russell* v. *Fav.er*, 18 La. 589. *Marks* v. *Landry*, 9 Rob. 526.

In all these cases, the contest was between the owner and attaching creditors or purchasers. But if the owner in such cases could recover, his creditors have still a higher right. The owner may be charged with imprudence, at least, in permitting possession to be obtained by false pretences; but the charge will not lie against creditors, who cannot, by any possibility, prevent their fraudulent debtor from secreting his property. His combination with another to defraud them, is independent of any action, or even knowledge, on their part. The parties who conspire are in fraud, but the creditors are innocent. If then, by such fraudulent conspiracy, the possession or title to the property passess to a fraudulent vendee, the sale must be considered void, *ab initio*, as to creditors, and not translative of the property. Such is the rule applied in England, and in the courts of the United States. The stat. 27 Eliz. c. 4, declares, that fraudulent conveyances may be avoided by creditors, unless the property shall have passed to an innocent purchaser for money or other good consideration. Sugden on Vendors, c. 16, p. 416. The rule that is constantly applied in the chancery courts is the same; and when such fraudulent conveyances were attacked by creditors, they have been repeatedly decreed void, *ab init o*, as to their effect upon the parties defrauded. "A deed founded in actual and positive fraud, as being made under the influence of corrupt motives, and with the intention to cheat creditors, may be considered void *ab initio*, and never to have had any lawful existence." Thompson, C. J., *Murray* v. *R.ggs*, 15 Johns. 586. *Osborne* v. *Moss*, 7 Johns. 164.

The distinction between a void deed and one only voidable has been repeatedly and learnedly discussed. *Mackie* v. *Cairns*, 5 Cowen, 579. *Henr.q es* v. *Hone*, 2d ed. Ch. R. 122. We do not enter into it, because it is deemed u necessary in the present argument. The deed may be good between the parties, yet if it is fraudulent as to creditors, if it is attacked by them and set aside, the nullity is retro-active. The fraud being established, the convey-

ance is treated as if it had not existed. Whatever may be the distinctions between void and voidable, the judges all concur in this result, that the fraud once shown, although the parties may be bound, the deed is void as to creditors. Neither the courts of common law nor chancery allow any exception to this rule, except in favor of a *bonâ fide* purchaser, for a valuable consideration. "And by the civil law, whatever debtors do to defeat their creditors is void, and there is a great resemblance between the civil law in this matter, and the statute of 13th Eliz." 1 Fonblanque's Equity, b. 1, ch. 4, s. 12, p. 204.

To the same purport is our own legislation. The Code gives to the creditor, his action to "annul." Art. 1965. And, if his action be maintained, the decree is, that the contract be "avoided as to its effects on the complaining creditor," &c. Art. 1972. The liability to attachment for debts of the fraudulent vendee, is one of the effects of the conveyance. The attaching creditor gives no consideration, for the right which he claims to exercise. He comes in under, and not through, the vendee. He seeks to avail himself of the interest of the debtor in the thing. If he had paid value for it, or advanced his money upon mortgage, his case would depend on other principles. But he seeks to avail himself as a creditor, of an apparent right of his debtor, and is met with proof that the right is not real, and is based in fraud. The positive language of the law then applies. The creditors who have been defrauded, are to be redressed. The title of the defendant in attachment is annulled; it is decreed void *ab initio*, as to the injured creditors, and the attachment necessarily falls, with the title or interest on which it was based. That an attaching creditor can stand on no better footing than his debtor, see *United States* v. *Vaughan*, 3 Binney, 400.

II. The registry laws, which declare that no act shall take effect against third persons unless recorded, are supposed to support the claims of the attaching creditor. We propose to show that such laws are not applicable to the case.

We hold, that these laws are simply intended to enforce publicity of transfers; and, for that purpose, they impose upon every purchaser the necessity of diligence in inscribing his act, at the risk of losing his property. In the two cases cited in the opinion of the court, this heavy penalty was incurred and enforced—*Hagan* v. *Williams*, 2 La. 122; *McManus* v. *Jewett*, 6 La. 531; and to the same point is the later case of *Crear* v. *Sowles*, 2 Ann. 598. In the case of *Stockton* v. *Briscoe*, 1 Ann. 249, the attachment was based upon the neglect of registry; it failed, because the inscription of the last act was considered sufficient; and the dissenting opinion, is an argument upon the tenor and policy of the laws passed to enforce the prompt registry of acts. The penalty for neglecting to register a conveyance, is fixed by an express enactment. The penalty may always be avoided, by compliance with the requisitions of the law. If a purchaser neglect to inscribe his title, he exposes himself to loss by his own fault or want of diligence. From motives of public policy, the risk of other rights being acquired is thrown upon the party in default. A purchaser who omits to comply with the law, can receive no favor from the courts. Whether those who oppose are creditors or subsequent purchasers, he has no right to complain. The provisions of the law may seem to be harsh, but his own diligence would have avoided its penalty. If he loses, it is by his own neglect.

But these considerations are wholly inapplicable to the creditors of a fraudulent vendor. They have done nothing which the law prohibits; they have omitted nothing which it commands. How then can the force of a registry law be opposed to them, when they complain of a fraud? The mere registry of a fraudulent title, would certainly not prevent a revocatory action. To give to the registry laws such effect, would be a perversion of their meaning. They are intended only to compel inscription; not to regulate equities between creditors, or to fix the consequences of fraud. If the conveyance be made in good faith, the registry is the perfection of the title; if made in fraud, other laws prescribe when, how, and by whom, it may be annulled. A case reported in Sirey, 1807, 877, affords the strongest illustration of this principle. By the laws of France, a tax was imposed upon all sales, in proportion to the price. In order to enforce this law, registry was required, with a statement of the price actually paid. It was further provided, that, if the parties attempted to avoid this impost, by counter letters, stipulating for a higher price than that stated in the public act, the counter letter was absolutely null. In a case arising under this law, the price mentioned in the act was 250,000 francs, while the true price, as represented by a counter letter, was 300,000 francs. The counter letter was null between the parties, yet the creditors of the vendor recovered the remaining 50,000 francs from the purchaser. The law declared the contract absolutely null, but the courts could not give it a construction which would enable the purchaser to retain part of the price justly belonging to the creditors. In the hands of the vendor, the agreement was null and reprobated, because he was guilty of a violation of the law; but his creditors were innocent, and the penalty intended for him, could not be inflicted on them. "Que c'est donc," says the court, "faire une fausse application de ces lois ou il s'agit de l'intérêt de tierces personnes, de légitimes créanciers, qu'on a trompés à leur insu, par la contre-lettre dont il s'agit, dans laquelle ils ne sont point parties, et que le vendeur, d'intelligence avec les acquéreurs, a voulu priver d'une partie de leur gage; que ce serait autoriser le dol contre les creanciers, et les rendre victimes de la simulation ou de la fraude qu'ils n'ont pu empêcher, si on annullait a leur égard le lettre qui la constate; ordonne," &c. 10 Dalloz, Jur. Gen. 675. Here the law pronounced absolutely null an agreement not contained in the public act; but the nullity was enforced only between the parties in fraud. Innocent creditors did not receive the stripes intended for fraudulent vendors. To follow the letter of the law would have been to annul its spirit. We repeat, therefore, that registry laws are intended to enforce diligence and to prevent frauds—not to favor them. No man can suffer by those laws who complies with their requirements. If a purchaser loses, he has only himself to blame. He may refuse to pay until his deed is inscribed, or he may inscribe it himself as soon as signed. But the law of registry cannot punish the creditors of the vendor, because it imposes no diligence upon them. Their rights are governed by rules and principles wholly distinct from those fixing the consequences of non-inscription. The proposition, that a title not registered has no effect against third persons, or creditors, does not embrace the proposition that a fraudulent title, if registered, will prevail against the creditors of the vendor.

III. What effect has art. 2236, as to counter letters, upon the issue now before the court? That article provides that counter letters can have no effect against creditors or *bonâ fide*

purchasers; but that they are valid as to all others. The article is applicable only to counter letters, bearing witness of a legal contract. If the object be illegal, the counter letter is void, and cannot be enforced between the parties. Act, 1887. On the other hand, the agreement being illegal, creditors may set it aside; they may use the counter letter as proof of the fraud; they may hold the vendee to its terms, although the vendor could not do it. The rule is reversed by the fraud. The parties cannot enforce the contract, but third persons can. The article is intended for cases where property is voluntarily, but innocently, conveyed. In such cases the vendor has his recourse against the vendee, but takes the risk of all other persons acquiring rights. If he has imprudently invested another with the insignia of ownership of his property, the law imposes upon him all the consequences of his imprudence. The creditors of the vendee, either precedent or subsequent, may seize it, and the real owner cannot complain. He is estopped by his own act, and is not permitted to set up his private counter letter, against the public title which he has himself conferred. It follows that this article is not applicable to cases of fraud.

That this is true, will, we think, be proved by reference to the decisions and treatises upon the corresponding article of the Code Napoléon, art. 1321—notes, Sirey, Code Annoté; 13 Duranton, n. 104; 8 Toullier, 186; S. & Villeneuve, 1842, 167; Dalloz, 1826, 1st part, 266; 10 Dalloz, Jur. Gen. 674. The principles established by these authorities, are uniformly discussed and decided, with reference to the effects of counter letters between the parties themselves, or between the parties and creditors. The party to the counter letter is always plaintiff or defendant. No case occurs of a conflict between the two classes of creditors, to wit, the creditors of the vendor and those of the vendee. The expression of the french article is, " les tiers," a term if possible more broad than that of the corresponding article of our Code, yet this article does not seem to have been applied to any case like the present. From one of the cases above cited, we may fairly presume that, if the position of the parties had been the same as in the present case, the counter letter would have been enforced.

IV. The articles of the Code giving to creditors their action to annul contracts of their debtors in fraud, apply to this case. We have endeavored to show that, no special law, relating to counter letters and registry, imposes upon the court the duty of inflicting a wrong upon the opponents; we have now to show, that the positive legislation of the Code, so far from commanding injustice, is entirely consistent with those principles of equity, for which we are contending, and which have been so repeatedly announced by chancellors and judges, in England and the United States. We think the case is fully covered by those articles of the Code, regulating the right of creditors to set aside contracts, in fraud of their rights. In the first place, the general principle is borrowed from the civil law, and consecrated by justice as well as by its age. " Every act done by a debtor, with the intent of depriving his creditor of eventual right he has upon the property of such debtor, is illegal, and ought, as respects such creditor, to be avoided." C. C. 1964, 1984, Dig. lib. 42, tit. 8, s. 1. 17 Poth. Pand. 406. 1 Domat, p. 495, lib. 2, tit. 10, s. 1. This general provision is equivalent to the provisions of the stats. of 13th and 27th Elizabeth, which have formed the basis of the english jurisprudence on the subject. But the Code has extended the principle still further, and prescribed its application to special cases, thus giving to the injured creditor more complete and definite relief, than he could obtain in a court of chancery. For instance, the court of chancery will not inquire into the adequacy of the price, unless it be so small as to be palpably fraudulent (2 Hovenden, 74), while the Code gives to the creditor the right of redeeming the property, even from an innocent purchaser, if the value exceed the price actually paid by one-fifth. Art. 1976. The english law does not prohibit a conveyance in payment of a just debt, while the Code declares that the insolvency of the debtor renders such a transfer iraudulent and void, and gives to the creditors the right of rescinding it, thus taking back the property for the mass, and reviving the debt paid by its transfer. Arts. 1977, 1978. The Code provides specially for cases in which the purchaser is innocent, and for those in which he is guilty of fraud, actual or constructive. In some cases restitution of price is made, with or without interest; in all, the property is recovered; and in all cases where the only consideration is a debt due, the only restitution made is, the replacing of the parties in the position in which they were before the transfer.

We presume that the plaintiff in this case, does not consider his attachment superior to the claim of a purchaser for a valuable consideration. If a purchaser for an inadequate price, he would be bound to give up the property, on the price being refunded. But he has paid no price; consequently we are compelled to place him a step lower in the scale. His position is nearest that of a creditor, who has obtained property in payment or as security. It is true that he does not obtain it from Hall, nor is Hall his debtor. But if the property, though in Craddick's name, really belongs to Hall, it is impossible to place a transfer to a creditor of Craddick, upon a better footing than a similar transfer to a creditor of Hall. That there are two fraudulent debtors, and two sets of creditors, cannot alter the principle, or prevent its application. The transfer to Craddick has been annulled. So far as he is concerned, his title is blotted out of existence. Then Stockton has acquired a lien on Hall's property, for the debt of another person. The basis of that lien, is a fraud upon the creditors of Hall. The rule laid down in the Code applies. The security thus acquired is annulled; there is no restitution, save replacing Stockton in his original position. He remains a creditor of Craddick as before his attachment.

Nor can it be pretended, that these provisions are inapplicable to attachment by legal process. The relief contemplated by the Code, is not confined to the case of contracts alone. Every act of the debtor in fraud, may be set aside or remanded. Arts. 1964, 1984. The act or contract with all its effects, is annulled. Arts. 1972. The levy of the attachment, was one of the consequences or effects of the fraudulent transfer.

The law is not confined to the cases specially enumerated in the Code. The cases stated are merely instances; the principles are embodied as the law.

If Stockton had taken a mortgage from Craddick for an old debt, his mortgage would be annulled. If he had bought the property for half its value, the property would be restored on refunding his advance; consequently he is to be put where he stood before. His attachment must be set aside, his notes go back to him. The only additional restitution that he could

possibly claim, would be his costs, until notice of the fraud. If more were allowed him, he would be more favored than an innocent purchaser, for he would receive more than he gave.

If we have not entirely failed in our argument, there is no special law, necessarily protecting this attachment against the just demands of the creditors of the true owner. The law of counter letters and of registry, being inapplicable, no other can be suggested leading to such a result. If the rules of the revocatory action do not apply, the conclusion must be, that in our most elaborate and highly artificial Code, there is no provision for a case of great importance and of frequent occurrence. Upon either hypothesis, this attachment must fail. If the Code does not provide for the case, we are thrown back upon those principles of justice and morality, which lie at the basis of all jurisprudence. Such principles are sufficient for the cause. No man can claim under a fraud, unless he has innocently advanced his money on the faith of the apparent title. If he has paid nothing, he can lose nothing by the fraud being redressed. If two parties are equally meritorious and equally innocent, the possession of one will not be disturbed for the profit of the other; but to say that they are equally meritorious, means that both have advanced their money, or that both are exposed to loss. The term does not apply when one only is exposed to loss, and the other has but the chance of gain. 1 Story, Eq. sec. 381. *Fletcher* v. *Peck*, 6 Cranch, 133. *Bean* v. *Smith*, 2 Mason, 272. 2 Vesey, Jun 458. 8 Mart. N. S. 342. 1 Mart. N. S. 387. *Walwyn* v. *Lee*, 9 Vesey, Jr. 24. 2 Fonblanque, Eq. b. 2, s. 2. 2 Hovenden, on Fraud, c. 18,‍p. 74.

V. The case has been thus far considered upon the supposition, that *Stockton* the attaching creditor, was not notified of the fraud. But we must again urge upon the court, that the circumstances were sufficient to put him upon enquiry, and he is therefore in law affected with notice of the fraud. The disproportion between the condition of the purchaser and the pretended price, was sufficient evidence of fraud and simulation. Can it be contended that the plaintiff, who knew this condition, and who saw the record of the purchase, was not put upon his guard? 2 Vesey, jun. 437. 1 Story's Equity, s. 399. If *Stockton* had purchased from *Craddick*, knowing his position as he confesses he knew it, he could not have been considered an innocent purchaser. When defrauded creditors are seeking restitution, even purchasers receive no favor, if they were put upon enquiry and did not choose to enquire. They may not shut their eyes and be accounted innocent, because they were willfully blind.

It " is notice of the use, therefore, that is all the effect of the matter; for then he is *particeps criminis, et dolus et fraus nemini patrocinantur*, since in conscience he purchased my lands or my goods. For the common law, whenever it found a consideration discharged the covin; but chancery looks further to the corrupt conscience of the party, that will traffic for what in equity he knows to belong to another. And in all cases where the purchaser cannot make out a title. but by a deed which leads him to another fact, the purchaser shall not be a purchaser, without notice of that fact, but shall be presumed cognizant thereof; for it was *crassa negligentia*, that he sought not after it, and this is in law a notice." 2 Fonblanque, p. 151, b. 2. s. 2.                                   *Re-hearing refused.*